# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-370 (EGS)** |
| **v.** | : | |
| | : | |
| **JENNIFER HEINL,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jennifer Heinl ("Heinl") to 14 days of incarceration, followed by 36 months of probation, and $500 restitution.

## I.     Introduction

The defendant, Heinl, and her friend, Kenneth Grayson ("Grayson")[1] (Case No. 21-cr-224 (TSC)), participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' of property damage.

Heinl pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, a sentence of 14 days incarceration,

---

[1] Grayson was arrested on January 26, 2021. On March 17, 2021, the grand jury returned an indictment charging Grayson with violations of 18 U.S.C. §1512(c)(2),2: Obstruction of an Official Proceeding; 18 U.S.C. § 1752(a)(1): Entering and Remaining in a Restrict Building or Grounds; 18 U.S.C. § 1752(a)(2): Disorderly and Disruptive Conduct in a Restricted Building or Grounds; 40 U.S.C. § 5104(e)(2)(D): Disorderly Conduct in a Capitol Building; and 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in a Capitol Building.

followed by 36 months of probation, is appropriate in this case because the defendant: (1) witnessed clashes with law enforcement outside the Capitol before she went inside and therefore was aware of potential for violence yet nonetheless chose to enter, (2) entered through the breached Senate Wing doors within ten minutes of the initial breach, (3) remained in the Capitol for approximately 47 minutes, (4) made multiple false statements to the FBI during a pre-arrest telephone interview, and (5) showed lack of remorse during a post-plea interview with the FBI.

The defendant was well aware of the violent conduct of the crowd that breached and entered the Capitol and yet chose to participate and enter herself; she enthusiastically stayed inside the Capitol for almost an hour; and while she acknowledges that she should not have been in the Capitol, she has failed to show sincere remorse for her actions.  After witnessing a violent confrontation between the crowd and law enforcement, and being exposed to tear gas and flashbangs, the defendant nonetheless proceeded up the steps of the Capitol building.  There she stood outside of the Senate Door while others breached the entrance.  Then she walked past shattered glass and entered the Capitol at approximately 2:20 p.m., less than ten minutes after the initial, violent breach of the Capitol.  While entering the recently breached Capitol, the defendant high-fived another rioter who was standing in the doorway.  The defendant then proceeded to remain within the Capitol for approximately 47 minutes before exiting with Grayson at approximately 3:07 p.m., when a large police presence was in the Rotunda attempting to clear the Rotunda of Heinl and her fellow rioters.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for her actions alongside so many others, the riot likely would have failed.  Here, the defendant's

extended participation in a riot that succeeded in halting the Congressional certification combined with the defendant's lack of sincere remorse and false statements to the FBI necessitates a sentence of incarceration.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 28 (Statement of Offense), at 1-3. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

### *Jennifer Heinl's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Heinl traveled with her friend Kenneth Grayson and two other individuals to Washington, D.C. from Pittsburgh, Pennsylvania to attend the "Stop the Steal" rally at the Ellipse. Heinl believes that one of the associates is related to Grayson and the other used to work with Grayson. However, she had not met them prior to January 5, 2021. After attending the rally on January 6, 2021, Heinl, Grayson, and the two associates proceeded towards the Capitol. While on the Capitol grounds, Heinl saw violent clashes between law enforcement and the crowd. At one point, Heinl was exposed to tear gas and could hear flashbangs. Nonetheless, Heinl, with the help of one of her travel associates, proceeded up a set of stairs towards the Capitol building. According to statements by Heinl during a post-arrest interview, she went towards the Capitol because she has PTSD and was in a fight or flight mode. Yet, while purportedly in this fight or flight mode, Heinl, by her own admission, shot a photograph at Grayson's request as they ascended the stairs.

3

According to an open-source video,[2] Heinl waited outside of the Senate Wing Doors as the initial rush of people breached the Capitol.  She can be seen standing near the Senate Wing Doors, looking down at her cellular telephone, and does not appear to be in distress.  In the captured footage, Heinl does not attempt to leave the area, but rather waits in the area as others breach the Capitol.  Although Heinl remains stationary in the video, the video shows Grayson, Heinl's companion, walk past Heinl towards the Senate Wing Doors.



(*Heinl circled in red; Grayson circled in blue*)

---

[2] *Available at* https://www.youtube.com/watch?v=_E-6bRNfx2c.  In this video, the area in front of the Senate Wing Doors is visible at the timestamp 21:40.  Heinl is visible in the area just to the right of the center of the video between the timestamps 21:43 to 22:11.  The videographer proceeded to walk closer towards the Senate Wing Doors and ultimately entered the U.S. Capitol, which has visibly shattered glass at the time stamp 23:20.

At approximately 2:13 p.m., the U.S. Capitol was first breached in this location, which is the entryway in the center of the above depiction, by a rioter who jumped through the window over the broken glass (depicted below).



At approximately 2:20p.m., which is approximately 7 minutes after the above depicted breach, Heinl entered the Capitol in this location and proceeded to give another rioter, who was standing in the center doorway, a high-five as she entered the Capitol with what appears to be a smile.



(*Heinl's Entry*)



(*Heinl's Entry*)

Notably, Grayson entered the Capitol through the same doors as Heinl, approximately 8 seconds prior to Heinl's entry.  Further, during her post-arrest interview, Heinl stated that she saw broken glass, likely a reference to either the broken glass in the above image of the initial breach or the broken glass at the approximately 23:20 timestamp of the above referenced video. According to Heinl, she saw law enforcement standing in the area but they were not preventing entry into the Capitol.[3]  Heinl proceeded to the extremely crowded Crypt, which she entered at approximately 2:22 p.m., and remained after the initial wave of rioters cleared the area.

---

[3] The video of Heinl's entry does not appear to depict law enforcement officers at the doors of her point of entry.  Notably, approximately at the 22:05 timestamp in the above-described publicly available video depicting Heinl moments before entering the Senate Wing door, there are visible law enforcement officers standing outside of the closed Parliamentarian doors.  At that point, the Parliamentarian doors had not been breached, possibly due to the law enforcement officers standing guard.



(*Grayson circled in blue and Heinl circled in red*)



(*Approximately 2:34 p.m.*)

Heinl later entered the Rotunda, where she eventually encountered Grayson.   At approximately 2:42 p.m., Grayson embraced Heinl and lifted and spun her in the air.[4]  This appears to be the first time they encountered each other after entering the Capitol, despite being in close physical and temporal proximity during their entry into the Capitol and later entry into the Crypt.

---

[4] During her post-arrest interview, Heinl stated that she had lost her friends and when she finally saw Grayson in the Rotunda, she yelled out towards him and gave him a hug.



Heinl interacted with Grayson at multiple times while in the Rotunda, although they were not continuously with one another. Heinl and Grayson eventually left the Capitol together at approximately 3:07 p.m., after spending over 45 minutes inside of the Capitol.

Heinl, Grayson, and their two associates drove back to Pittsburgh on January 6, 2021. During her plea hearing, Heinl admitted that she knew at the time she entered the Capitol that she did not have permission to do so, and she paraded, demonstrated, or picketed inside.

*Heinl's Interviews*

*Pre-Arrest Interview.* On January 28, 2021, just a couple of days after Grayson's arrest, the FBI conducted a telephonic interview of Heinl regarding her and Grayson's activities on January 6, 2021. During this interview, Heinl made several false and misleading statements. For example, Heinl falsely maintained that she drove to Washington, D.C. alone; that she originally planned to attend the rally with Grayson but ultimately decided to go alone; and that she did not believe that she and Grayson stayed at the same hotel on January 5, 2021. Heinl admitted that she stayed on the Capitol grounds for approximately 45 minutes but falsely told the FBI that she did not enter the Capitol with Grayson. At one point during the interview, Heinl stated that she saw Grayson outside of the Capitol, but at another point during the interview, she stated that she texted Grayson

and they met at the Ellipse.  Finally, Heinl falsely stated she did not speak to Grayson after January 6, 2021.  However, Facebook records revealed that Heinl and Grayson communicated with each from November 2020 through at least January 11, 2021, including a discussion on travel arrangements to Washington, D.C.

*Post-Arrest Interview.* On March 18, 2021, Heinl agreed to participate in a post-arrest interview.  During this interview, she admitted (contrary to prior statements) that she traveled to Washington, D.C. with Grayson, whom she regarded as a big brother, and two other individuals, whom she met that day for the first time.  She also admitted (contrary to prior statements) that they all stayed in the same hotel suite, which was reserved by Grayson.  Heinl claimed that she wanted to attend the rally to see the speakers and hoped to witness history when the Senate overturned the election.  According to Heinl, she, Grayson, and the two other individuals accompanying them listened to the speeches at the rally on January 6, 2021, and then, as mentioned by then-President Trump, walked towards the Capitol to protest peacefully.

Heinl admitted that she witnessed fighting between the crowd and law enforcement after she arrived at the Capitol.  According to Heinl, at that point she did not know where Grayson or the others were, and another individual lifted her up onto some sort of platform, telling her that she was about to get smashed.  Heinl asserted that she has PTSD from a prior attack and felt frozen due to the fighting between the crowd and law enforcement.  Heinl said that while she was filming events, she saw approximately eight police officers walk towards the crowd and then saw the crowd fight the officers.  Heinl said that she was shocked when she witnessed this clash and even verbally expressed the shock while filming.  Heinl said that she was then exposed to tear gas and could hear flashbangs in the crowd and experienced a feeling of flight or fight.  Heinl said she fell, her nose and eyes were runny, and she started to crawl until she found a water bottle.  She stated

that she wanted to get out of the area and saw one of her travel associates with whom she went up the stairs towards the building and got more water. Even though she claimed she was frightened, she admitted that she nonetheless saw Grayson and the others while going up the stairs and took a photograph for them at their request. According to Heinl, when she got to the top of the stairs, she saw the doors open, people going in, and police officers present. She claimed that she did not want to go back down the stairs after hearing people yell antifa, and she went into the Capitol and called her mother to tell her she felt safe inside and that law enforcement officers were present inside.

Heinl asserted that no one pushed back on the crowd as people filed into the Capitol. She said if that were to happen, she would never have disrespected a cop and gone inside. Heinl admitted that she saw a broken window, she thought to herself that the broken glass was not a good sign, and she noticed officers standing there. But Heinl claimed that the officers did not tell her to leave, and she was not told to leave until she was in the Rotunda.

Heinl stated that when she got to the Rotunda, there were thousands of people, a lot more officers, and "people just chilling, taking pictures, laughing, and hugging." According to Heinl, she decided to stay in the Rotunda because she was still recovering from the tear gas and was cold. Heinl claimed that it was in the Rotunda where she saw Grayson for the first time in the Capitol, and she yelled out for him and hugged him when she saw him. Heinl stated that they separated again, and after Grayson later returned, the officers told them to leave. Heinl stated that she then heard that someone had been shot, and according to Heinl, that is when she thought she has had enough and that that is not what she came to do.

Heinl stated that she did not know that the Capitol was closed and that she thought the area she was in was open to the public all of the time. She claimed it was not until after she left and learned of the destruction and fighting inside that she realized they should not have been there.

Heinl said she believed that she and Grayson left the Capitol before 4 p.m. and departed from the grounds around 4 p.m. or 4:30 p.m. She also stated that she did not witness violence or destruction inside the Capitol. However, she later stated she did recall seeing someone knock over a stanchion; according to Heinl, this upset her and others. She said that if she saw someone take something, she would have said something to them. She also stated that she did not yell while inside of the Capitol and did not touch anything or pose with any statutes while in the Capitol. She said that while she knows she should not have been there, at the time she felt like it was the safest place. She also stated that, while inside of the Capitol, she was focused on staying warm and trying to get herself under control from all of the adrenaline in her body with the fight or flight feeling.

Heinl also stated that Grayson followed the Qanon movement. She said that after leaving the Capitol, she asked Grayson if he hurt anyone or took anything. According to Heinl, Grayson replied in the negative. She told Grayson that they were going to get in trouble because they were not supposed to be inside of the Capitol. According to Heinl, Grayson replied that she did not do anything and that she was teargassed. Heinl replied to him that she understands that but the only reason why she went inside was because she was not going to stay outside with those "crazy people so I kind of just followed you guys and went in there."

When asked about her prior telephone interview on January 28, 2021, she stated she thought it was a joke or to see if she would "snitch."[5] She said she thought the FBI would interview her in person, not via telephone. Heinl apologized and said she realized later that the interview had been legitimate.

*Post-Plea Interview.* On November 15, 2021, after pleading guilty in this case, Heinl, with her attorney present, was interviewed regarding her activities on January 6, 2021. Heinl stated that

---

[5] Heinl also stated that she did not know Grayson had been arrested at that point.

she traveled to Washington, D.C. with Grayson and two others to attend the rally.  Heinl again stated that she had been exposed to tear gas and knocked to the ground outside of the Capitol building.  She stated she entered the Capitol but not with Grayson.  Heinl also reiterated that the police did not stop their entry into the Capitol.  Further, she reiterated her claim that she entered the building for safety and warmth.

*The Charges and Plea Agreement*

On March 17, 2021, Heinl was charged by complaint with violating 18 U.S.C. § 1752(a)(1) and 40 U.S.C. § 5104(e)(2). On March 18, 2021, she was arrested at her home in Pennsylvania. On May 20, 2021, Heinl was charged by four-count Information with violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G). On November 2, 2021, she pleaded guilty to Count Four of the Information, charging her with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building.  By plea agreement, Heinl agreed to pay $500 in restitution to the Department of the Treasury.

## III.    Statutory Penalties

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the

nature and circumstances of the offense, § 3553(a)(1); the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration.

### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction;

(5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.  To be clear, had the defendant personally engaged in violence or destruction, she would be facing additional charges and/or penalties associated with that conduct.  The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases.

The violent scene witnessed by Heinl was made possible, in part, by her presence.  The thousands of rioters together gave way for the violent clashes with law enforcement, something Heinl witnessed firsthand before entering the Capitol building.  Even after seeing this violence – and observing the police deploy tear gas and flashbangs – she did not attempt to leave the grounds of the Capitol and retreat from the building.  Rather, she went towards the Capitol, where the rioters had smashed through a window to enter through the Senate Wing Doors, and then she walked by the broken glass and entered the Capitol with a high-five and a smile, proceeding to occupy the Capitol with thousands of other rioters for approximately 47 minutes.  Therefore, while she, herself, did not plan or engage in acts of violence, she nonetheless contributed to the mob of rioters by breaching the Capitol grounds and thereby emboldening the violent rioters.

Heinl has projected a distressed scene where she had no choice but to enter the Capitol.  However, her actions – both what she has admitted and what has been recorded on video – counter that sentiment.  Notably, she claimed to be in a state of shock by the crowd fighting with the officers on the Capitol grounds, yet she admitted that she filmed the events.  Having the ability to

14

film the rioters is inconsistent with the assertion that she was in fear of her own safety. Similarly, during her alleged "fight or flight" route away from the violence on the Capitol grounds, Heinl did not attempt to leave the grounds of the Capitol but instead went towards Capitol itself, were crowds of violent rioters were converging in an attempt to breach the Capitol and enter; and on the way up the stairs towards the building, she was sufficiently calm to fulfill Grayson's request to take a photograph. Stopping to take a commemorative photograph, even assuming Heinl did so reluctantly, is the antithesis of fleeing an area for safety.

Additionally, video footage shows Heinl standing and looking at her cellular telephone just outside of the Senate Wing Doors, which she later entered less than ten minutes after the initial breach by a rioter jumping through a broken window. If she feared for her safety, she could have (and should have) left the Capitol grounds. Instead, she entered the Capitol building approximately seven minutes after the Senate Wing door was breached and approximately eight seconds after Grayson. Perhaps most conspicuously, she appears to be smiling as she entered and gave a fellow rioter a high-five. Her mannerisms at the time she entered the Capitol, as captured on video, are the best evidence of her state of mind at the time, and those mannerisms strongly indicate that she did not fear for her safety and enter the Capitol for that reason, as she told the FBI, but rather because she wanted to participate and join her fellow rioters inside the Capitol. She chose to continue to be a part of this riotous crowd by entering the Capitol and then staying inside for 47 minutes.

Notably, during her post-arrest interview, Heinl stated that she realized she had had enough and that she was getting out of there when she heard someone had been shot. Therefore, it appears that in Heinl's mind, seeing violent clashes between protestors and law enforcement, deployment of tear gas, flashbangs, and broken glass at her entry point were not signs that things were out of

control.  It was only when someone was shot that she felt it was time to go.  Her reaction to the violence, which she witnessed firsthand, further illustrates her support of what her fellow rioters were doing on the Capitol grounds.  Moreover, her smile and high-five at the point of entry, once again after seeing violent clashes with law enforcement and broken glass at the entry point, demonstrates a sense of encouragement and celebration over what her fellow rioters were able to accomplish.

Heinl has also consistently demonstrated a lack of sincere remorse.  Moreover, she continues to minimize her actions on January 6, 2021.  In the weeks after the breach of the Capitol, Heinl's lack of remorse and contrition was apparent when she telephonically spoke with the FBI a couple of days after Grayson's arrest.  During this interview, she made several false statements to the FBI, minimizing her conduct and the conduct of others by distancing herself from Grayson and denying that she entered the Capitol.  Although she later claimed that she thought it was a prank call on behalf of Grayson because she believed the FBI would interview her in person, that explanation lacks credibility and, even if credited, does not assist Heinl.  Heinl either intentionally made false statements to law enforcement in the weeks after the Capitol riots or (if her explanation is credited) thought it necessary and appropriate to demonstrate to someone posing as law enforcement that she would be unwilling to "snitch" if contacted by the FBI.  In either scenario, she demonstrated that she has failed to understand or acknowledge the severity of her conduct or take responsibility for her actions and express sincere remorse and clearly placed her interest above those of others - she falsely distanced herself from Grayson and denied ever entering the Capitol.  Further, in the aftermath of the riots, knowing more fully what transpired on January 6, 2021, her lack of seriousness towards the investigation is palpable.

Even after pleading guilty in this case, Heinl, continued to minimize her culpability in a manner that lacks credibility and is inconsistent with other evidence. During a post-plea interview, she reiterated her claim that she entered the Capitol because she sought safety and warmth. But as discussed above, it defies belief that someone seeking safety would head toward the forefront of a riotous mob breaching the Capitol and take a souvenir photograph along the way. Furthermore, video footage of Heinl before she went inside the Capitol shows that she did not appear in distress and that rather than heading into the Capitol she could have instead left the grounds of the Capitol to seek safety. Heinl also repeated, during her post-plea interview, that officers did not prevent her entry into the Capitol. But while officers may not have been immediately present at her point of breach, common-sense dictates that the violent clashes and broken glass made clear that she was not allowed inside of the Capitol. Even after pleading guilty in this case and admitting that she knew at the time she entered the Capitol that she did not have permission to go inside, Heinl continues to rationalize that police officers did not stand in the way of her entry, highlighting her lack of sincere remorse or contrition.

Accordingly, the nature and the circumstances of this offense establish the need for a sentence of imprisonment.

### B. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[6] As with the nature and circumstances of the offense, this factor supports a

---

[6] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20

sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### C. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy.

---

Testimony.pdf

It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Heinl's pre- and post-arrest interviews demonstrate the need for specific deterrence for this defendant. She has consistently attempted to minimize and rationalize her conduct. Among other things, as described above, she has continued to state that officers did not prevent her entry into the Capitol, which highlights her lack of remorse or contrition. This further calls into question whether she would repeat her mistakes and engage in the same type of conduct if circumstances like the Capitol riot were to arise again. The need to send a message that the defendant cannot simply turn a blind eye to her fellow violent rioters and ignore the law warrants a serious sentence in this case.

### D.  The History and Characteristics of the Defendant

As set forth in the PSR, Heinl does not have a prior criminal history and has a consistent employment history, including periods of maintaining multiple jobs at a given time.  Heinl also disclosed a 2012 work incident where she was attacked and sexually assaulted by two patients in a psychiatric hospital, which resulted in her being diagnosed with post-traumatic stress disorder and anxiety.  She also revealed that she has two sons, both of whom have medical conditions requiring additional care.  She noted that her eldest son is often sick.

While Heinl should be commended for her work history and lack of prior criminal history and applauded for the care she extends to her sons, these factors do not excuse her actions on January 6, 2021.  Any mitigation warranted by her personal life do not outweigh the factors supporting an incarceration sentence, such as the false statements to the FBI and the circumstances of her entry and activity in the Capitol.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[7] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum,

---

[7] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[8] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that cases probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The defendant has pleaded guilty to Count Four of the Information, charging her with Parading, Demonstrating, or Picketing in the Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

---

[8]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should

become more apparent. The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentence imposed on defendants Eric Torrens (21-cr-204 (BAH)) and Jeremy Ryan Sorvisto (21-cr-320 (ABJ)) for reference.

Similar to Heinl, Torrens witnessed the crowd repeatedly attack law enforcement officers on the Capitol grounds and observed tear gas being deployed, before proceeding up towards the Senate Wing doors. Also, similar to Heinl, Torrens entered the Capitol at approximately 2:18 p.m., which is approximately two minutes before Heinl, and appeared gleeful when he was able to enter the Capitol, as evidenced by his selfie-style video. After entering the Capitol through the same doors as Heinl, he proceeded to the Crypt, just like Heinl. However, after approximately 10 minutes, Torrens exited the Capitol through the same doors he entered, which is very unlike Heinl's approximately 47-minute journey in the Capitol. Torrens also expressed remorse at multiple times. On August 19, 2021, Torrens pled guilty to 50 U.S.C. §5104(e)(2)(G). The government recommended a sentence of two weeks incarceration and on October 29, 2021, the Court sentenced him to 90 days of home detention and 36 months of probation.

In another comparable case, Sorvisto entered the same point of entry as Heinl but approximately five minutes after Heinl. Based on the timing of his entry, Sorvisto likely saw violence being committed prior to his entry. Sorvisto, like Heinl, proceeded to the Crypt and stayed in the Capitol for approximately twenty-five minutes. Sorvisto took a selfie while inside of the Capitol and also used another person's Facebook account to report they were being "gass[ed]." While in the Capitol, he is seen picking up litter and left the Capitol when instructed by law enforcement. After leaving the Capitol, he instructed another person to delete photographs

of him in the Capitol and also discarded his jacket.  Sorvisto did not show remorse for his conduct, nor did he admit his unlawful conduct to law enforcement officials even after his associate was arrested and charged.[9]  On September 3, 2021, Sorvisto pled guilty to 40 U.S.C. §5104(e)(2)(G). On December 15, 2021, the Court ultimately sentenced the defendant to 30 days' incarceration and $500 in restitution, the sentence recommended by the government.  A sentence of incarceration is similarly warranted for Heinl.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.    The Court's Lawful Authority to Impose a Split Sentence

The sentence requested by the government—14 days of incarceration followed by 36 months of probation—is a lawful one. A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d

---

[9] When Heinl agreed to a telephonic interview with the FBI a couple of days after Grayson's arrest, she made several false statements.  Heinl, however, claimed during her post-arrest interview that she did not know Grayson had been arrested at the time of her telephone interview.

36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense, such as the crime at issue in this case. *See* 18 U.S.C. § 3561(a)(3). In addition, for a defendant convicted of any federal offense, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

### a.  *A sentence imposed for a petty offense may include both incarceration and probation.*

#### i.  Relevant Background

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today. *See* Pub. L. No. 98–473, §§ 211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing). That legislation falls in Chapter 227 of Title 18, which covers "Sentences." Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment"). Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[10] followed by a term of probation, such as the sentence requested by the United States here.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences." Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided." 18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by

---

[10] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10). *See* Part V(b) *infra*.

subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[11]  As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation."  As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3).  In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991).  Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report).  In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation

---

[11] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence." 18 U.S.C. § 3551(b).

unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).

ii.  Analysis

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases. *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).  In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583. S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background. But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).  It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation. *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam).  In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison. *Id.* at 808.   In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense."  The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*

148 (2012).  Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49.  And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense."

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants.  *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense).  When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for three reasons.  First, Section 3551(a) notes that the sentencing provisions described there apply "[e]xcept as otherwise specifically provided."  Section 3561(a)(3) does "provide[]" "otherwise": it recognizes a carveout for petty offenses.

Second, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b).  *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one.").  When Congress enacted the general

prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). *See supra*, at 23 (recounting statutory history).   That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184.  In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Ibid.*

Third, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Ibid.*   Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147-CKK, Doc. 70 at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning.  When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous

incarceration and probation in a single sentence.  Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991, *see supra*, at 23, does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense.  For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted). Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation).  Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation). No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense.  Here, Heinl pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in a Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine. *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

**b. *A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.***

i. <u>Relevant Background</u>

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation." 18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.* [12]

ii. <u>Analysis</u>

A sentencing court may impose one or more intervals of imprisonment up to a year (or, as here, up to the six-month statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time." 18 U.S.C. § 3653(b)(10). Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section

---

[12] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation." S. Rep. No. 225, 1983 WL 25404, at *98.

3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[13] That would be an appropriate sentence in this case.

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure. In this case, the government does not request that imprisonment be imposed through "intermittent" confinement as a condition of probation.

---

[13] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

## VI.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Heinl to 14 days' incarceration, followed by 36-months' probation, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on defendant's liberty as a consequence of her behavior, while recognizing her early acceptance of responsibility.


Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:          */s/ Maria Fedor*
MARIA Y. FEDOR
Attorney, detailed to the
United States Attorney's Office for the
District of Columbia
D.C. Bar No. 985823
555 Fourth Street, N.W.
Washington, DC 20530
Maria.Fedor@usdoj.gov

## CERTIFICATE OF SERVICE

On this 28th day of February 2022, a copy of the foregoing was served upon all parties

listed on the Electronic Case Filing (ECF) System.


By:     /s/ *Maria Y. Fedor*
        MARIA Y. FEDOR
        D.C. Bar No. 985823
        Attorney, detailed to
        United States Attorney's Office
        for the District of Columbia
        Maria.Fedor@usdoj.gov