IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          )
                                   )
             v.                    )        Case No. 21-CR-00370
                                   )
JENNIFER HEINL                     )
                                   )
              Defendant.           )        Electronically Filed

DEFENDANT, JENNIFER HEINL'S SENTENCING MEMORANDUM

AND NOW comes Defendant, Jennifer Heinl, by and through her attorney, Martin A. Dietz,

Esquire, and respectfully files the following Sentencing Memorandum on the following basis:

Defendant, Jennifer Heinl (hereinafter "Ms. Heinl"), incorporates the facts set forth in the

Presentence Investigation Report.    Additionally, Ms. Heinl asks the Court to consider the

information and arguments contained herein in fashioning the appropriate sentence in this case.

The government seeks a sentence of 14 days' incarceration followed by a term of probation

of 36 months because Ms. Heinl:

> (1) witnessed clashes with law enforcement outside the Capitol
> before she went inside and therefore was aware of potential for
> violence yet nonetheless chose to enter, (2) entered through the
> breached Senate Wing doors within ten minutes of the initial
> breach, (3) remained in the Capitol for approximately 47 minutes,
> (4) made multiple false statements to the FBI during a pre-arrest
> telephone interview, and (5) showed lack of remorse during a post-
> plea interview with the FBI.

At the time Ms. Heinl entered her guilty plea in this case (and during plea negotiations), and when

the government was fully aware of reasons (1)-(4) above, the government (through the previous

Assistant United States Attorney assigned to this case) represented that it did not anticipate that it would seek a term of imprisonment in this case.  For some reason, presumably the government's new incorrect assertion that Ms. Heinl lacks remorse, that position has changed.    Despite the government's change of mind, and, for the reasons that follow, Ms. Heinl respectfully requests that this Court impose a probationary sentence in this case.  Such a sentence is consistent with the goals of sentencing.

Ms. Heinl agrees with the government that the United States Sentencing Guidelines do not apply to the offense of conviction in this case because the offense of conviction is a Class B misdemeanor.   See U.S.S.G. §1B1.9.  Therefore, in this case, this Court should be guided by the 18 U.S.C. §3553(a) factors:

1) the nature and circumstances of the offense and the history and characteristics of the defendant;

2) the need for the sentence imposed –
    (A) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3) the kinds of sentences available;

4) the kinds of sentence and the sentencing range established for –

    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
        (i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 944(p) of title 28); and
        (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or
    (B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into

amendments issued under section 994(p) of title 28);

5) any pertinent policy statement—
    (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28,
    United States Code, subject to any amendments made to such policy statement by act of
    Congress (regardless of whether such amendments have yet to be incorporated by the
    Sentencing commission into amendments issued  under diction 994(p) of title 28);
    and
    (B) that, except as provided in section 3742(g), is in effect on the date the defendant is
    sentenced.

6) the need to avoid unwarranted sentence disparities among defendants with similar records who
    have been found guilty of similar conduct; and

7) the need to provide restitution to any victims of the offense.

## Sentencing Factors Under 18 U.S.C. §3553(a)

## I.    Nature and Circumstances of the Offense and History and Characteristics of the Defendant

There is no limitation on the information that this Court can consider in fashioning an appropriate sentence.  See 18 U.S.C. §3661; 18 U.S.C. §§3553(a)(1).   While the offense of conviction is undeniably serious, Ms. Heinl respectfully requests that this Court impose a probationary sentence.  Ms. Heinl does not make her request gratuitously.  As set forth more fully below, this case presents the Court with a justification for such a sentence.

The instant prosecution centers around the horrific events of January 6, 2021.  Those events have been chronicled in the media, in the Presentence Investigation Report, and at Ms. Heinl's change of plea hearing.  The circumstances of the January 6th riot were violent and an unjustifiable attack on America.   Ms. Heinl recognizes the seriousness of the events that transpired that day and she accepts responsibility for her role in those events.  She is extremely

3

remorseful, embarrassed and ashamed.   With the consent of the government, Ms. Heinl has pled guilty to a Class B misdemeanor and has accepted responsibility for violating 40 U.S.C. §5104(e)(2)(G) because she unlawfully entered the U.S. Capitol on January 6, 2021.   Ms. Heinl did not participate in any specific violent acts nor did she commit any specific acts of vandalism or destruction.   She was not physically aggressive, she did not scream, yell or solicit others to participate in the events of January 6th.   She did not post images or videos of her conduct on social media. After walking around the Rotunda and Crypt areas of the Capitol for approximately 45 minutes, she exited the Capitol.   She recognizes that an appropriate punishment for her actions is warranted in this case.

In addition to the circumstances of the offense of conviction, Ms. Heinl also asks that this Court consider Ms. Heinl' personal characteristics.   She is 44 years old and, other than the offense of conviction, Ms. Heinl has led an otherwise lawful life. She has no prior criminal record and has never received as much as a traffic ticket.    As set forth in the Presentence Investigation Report, Ms. Heinl has always maintained steady employment.    She is the primary caretaker for her 14 year old son who suffers from a condition that requires him to receive daily intravenous medications that Ms. Heinl typically administers.   She also has another son who has recently suffered serious medical issues resulting from an autoimmune disease.   Ms. Heinl's record reflects that she has been a great mother to her two children.  Ms. Heinl maintains a very close relationship with her mother.   These matters are more fully discussed in the Presentence Investigation Report.

Ms. Heinl's conduct on January 5, 2021 and January 6, 2021 have had profound, adverse consequences for her.  While the Presentence Investigation Report indicates that Ms. Heinl and her husband are separated, the current status of their relationship has changed.   Ms. Heinl's

husband has filed for divorce and final approval is pending but should occur in the near future. Ms. Heinl's participation in the events of January 5, 2021 and January 6, 2021 and her subsequent guilty plea have led to the divorce.   Ms. Heinl is now living on her own with her son.

Ms. Heinl was also fired from her position as a nurse at the VA Hospital in Pittsburgh, Pennsylvania because of her participation in the events of January 5, 2021 and January 6, 2021. Many friends have chosen to no longer associate with Ms. Heinl.     While these adverse consequences are not formal, they are real and have severely impacted Ms. Heinl's everday life.


Ms. Heinl asks the Court to consider the words of her supporters.   Attached to this memorandum are various letters from a number of Ms. Heinl's supporters.  Home addresses and telephone numbers have been redacted from the letters.  These supporters lend credence to the fact that Ms. Heinl's conduct in this case is far beyond the norm for her.  She is a wonderful mother, daughter, sister and friend.  Katie Gagliano, Ms. Heinl's sister, writes about Ms Heinl's tremendous character.   Kimberly Lemaster describes Ms. Heinl's kind and compassionate nature in treating patients at the VA Hospital.  Kelly Kerr also comments on Ms. Heinl's performance at the VA Hospital.  Joseph Larkin informs the Court about his experience with Ms. Heinl and the fact that she appreciates the significance of her actions.   Jennifer Ingram discusses Ms. Heinl's volunteerism, the fact that she puts others before her and the steps she takes as a single mother to provide for her sone.  Amy Capuzzi, Ms. Heinl's best friend, offers positive commentary on Ms. Heinl's living and caring nature and her qualities as a single mother.  Her mother and ex-husband have also provided positive commentary about Ms. Heinl in the Presentence Investigation Report.   Additional letters will also be provided to the Court under separate cover.


Ms. Heinl would like to address the comments made by the government in its sentencing memorandum alleging her lack of remorse in this case.     Ms. Heinl wants this Court to know

that she is truly remorseful for her actions.  The government has incorrectly interpreted certain of her reactions or comments as demonstrating a lack of remorse.   What the government does not realize is that Ms. Heinl suffered serious emotional and physical trauma in 2012 while she was working as a nurse at the Western Pennsylvania Psychiatric Hospital. The circumstances of the trauma are detailed in paragraph 61 of the Presentence Investigation Report and, due to the sensitivity of those circumstances, they will not be described in detail herein.   As a result of the incident described in the Presentence Investigation Report, Ms. Heinl continues to suffer from Post-Traumatic Stress Disorder ("PTSD") and it has affected her personality. It sometimes affects the way she responds to stressful situations and it sometimes impacts the way people view her responses or reactions during stressful situations.  To be clear, though, Ms. Heinl's decision to enter the U.S. Capitol was not caused by her PTSD.  She fully accepts responsibility for those actions.

The government rehashes Ms. Heinl's first interaction with the FBI to convince this Court that Ms. Heinl is not remorseful for her conduct.  The government is simply wrong.  On January 28, 2021, Ms. Heinl received a telephone call from someone purporting to be an FBI agent asking her about her conduct and the conduct of Kenneth Grayson on January 5, 2021. Kenneth Grayson, another defendant charged relative to the January 6th riot, had been arrested a few days before.  Ms. Heinl did answer some of the questions posed to her, but she did not truthfully answer other questions, namely questions relating to Grayson.  Later, after Ms. Heinl reached out to her husband, she was informed that the person who called her really was an FBI agent.  Ms. Heinl then agreed to cooperate with the government in this case.  During her next interview, she advised the government that she did not think that the person on the phone during the initial call was really an FBI agent but rather someone probing her to determine whether she was cooperating against Grayson.   The government has argued that the "explanation lacks

credibility and, even if credited, does not assist Heinl."

Ms. Heinl's explanation is credible.   Undersigned counsel has been predominantly practicing federal criminal law for approximately 29 years.   In all those years, undersigned counsel is not aware of one case where the first contact with a target of a federal criminal investigation was made via a telephone call from someone purporting to be a federal agent unless that agent was acting in an undercover capacity, which did not occur here.   Moreover, Ms. Heinl was somewhat familiar with the operation of the FBI by virtue of her estranged husband's employment (See Paragraph 47 of the Presentence Investigation Report).   Despite the fact that her estranged husband's local agency was investigating the January 6th riot, Ms. Heinl did not recognize the name of the agent who contacted her.   She was not provided with any credentials from the person who made the call.   Ms. Heinl would have also expected that her estranged husband would have been involved, to some degree, with a legitimate attempt to interview her. The questions posed to her were generally focused on Grayson.   It is respectfully submitted that the circumstances of the FBI's initial interactions with Ms. Heinl were so outside the usual course of FBI business that her belief that someone was reaching out to her to determine if she was cooperating against Grayson was credible.

As set forth above, Ms. Heinl did learn, after contacting her estranged husband after the initial phone call, that the person who placed the telephone call was an actual FBI agent.   Once she realized that the FBI seriously wanted to speak to her, she agreed to be interviewed and she agreed to fully cooperate with the government in the investigation of the events of January 6, 2021.   During the formal interview, she acknowledged that some of her statements during the initial telephone call were not true.   As set forth in the government's sentencing memorandum, she provided truthful information to the government during the formal interview.    After the

formal interview, the parties negotiated the plea agreement reached in this case.   The parties discussed Ms. Heinl's conduct inside the Capitol and the circumstances of the first telephone call.   The government informed undersigned counsel that if Ms. Heinl entered a guilty plea as set forth in the plea agreement, it anticipated it would not seek a jail sentence.

The government now claims that Ms. Heinl's post-guilty plea interview demonstrates that she has no remorse for her conduct in this case.   Apparently, the government bases this assertion on the fact that Ms. Heinl made statements during her post-guilty plea interview to minimize the seriousness of her conduct.   During her interviews, she described the atmosphere just prior to her entry into the Capitol.   The government seems to describe the events of January 6th in a vacuum. However, the atmosphere was, unfortunately, constantly changing.   Tear gas was administered. Loud sounds, which Ms. Heinl believed to be "flashbangs" were heard.   The mass of people became so large and unruly that the risk of getting trampled was real.   During the interviews, Ms. Heinl simply commented that entry into the Capitol was the physically safer path to avoid the masses.   Additionally, Ms. Heinl stated during the interviews that when she entered the Capitol, the doors were not blocked by law enforcement officers.   She also stated she was scared at time and she feared for her safety.   Based on what was occurring at the time she entered the Capitol, these facts were true.   Ms. Heinl has never justified her entry into the Capitol based on the fact that had no option but to enter it.   She also has never said she went in because there was no law enforcement keeping her out.   She knows she unlawfully entered the Capitol and she understands the significance of her actions.   The government has relied on a number of other facts to demonstrate her lack of remorse: she used her cell phone to film/photograph parts of the events, she high-fived another person, she smiled inside the Capitol.   These events may reflect her state of mind while the events occurred but they do not demonstrate her lack of remorse.

## II. The Need for the Sentence Imposed –

### A.    To Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provides Just Punishment for the Offense

Ms. Heinl has incurred and will continue to incur significant consequences because of her conduct.  The extensive, international publicity from her conduct and subsequent guilty plea has caused Ms. Heinl great humiliation and embarrassment among her family, friends and other peers.  Her case has been covered extensively by every major media outlet in Pittsburgh, her hometown.  As set forth above, she has lost her marriage, a job and friends as a result of her conduct. This informal form of punishment has been real and severe.

As stated above, Ms. Heinl is statutorily eligible for a term of probation.  While Ms. Heinl is respectfully requesting a probationary sentence, she in no manner means to demean the seriousness of the crime for which she has been convicted.  Probation, however, is a serious punishment – a punishment which Ms. Heinl does not take lightly.   There is no question that such sentences are punitive.  Notably, the Supreme Court has noted that probationary sentences substantially restrict a defendant's liberty.   Gall v. United States, 522 U.S. 38, 128 S.Ct. 586, 595 (2007)(In imposing a probationary sentence, the Court noted "[p]robationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. U.S.S.G. §5B1.3.   The

Supreme Court has expressed that a probationary sentence "rather than 'an act of leniency,' is a 'substantial restriction of freedom.'" Id. at 593.   In Gall, the Supreme Court referenced the district court's memorandum opinion where the judge stated:

> [The defendant] will have to comply with strict reporting conditions along with a three-year regime of alcohol and drug testing. He will not be able to change or make decisions about significant circumstances in his life, such as where to live or work, which are prized liberty interests, without first seeking authorization from his Probation Officer or, perhaps, even the Court. Of course, the Defendant always faces the harsh consequences that await if he violates the conditions of his probationary term.

Id.   In Gall, the advisory guideline range suggested a term of imprisonment of 30-37 months and the defendant in Gall was not the beneficiary of a §5K1.1 motion yet a probationary sentence was appropriate.


**B.      To Afford Adequate Deterrence to Criminal Conduct**

A sentence of probation also satisfies the deterrence prong of Section 3553.  Under this prong of Section 3553(a), courts assess whether a sentence will provide sufficient specific deterrence to the defendant from committing future crimes, and general deterrence to the public, deterring others from committing similar offenses.

### 1.    Specific Deterrence

Ms. Heinl has been thoroughly deterred by the consequences she has already experienced, as set forth more fully above, including the tremendous humiliation and shame she has brought on herself and her family.   Contrary to the position of the government, she has also exhibited a full understanding of what she did wrong.   Under 18 U.S.C. §3582, a sentencing judge is required to "recogniz[e] that imprisonment is ***not*** an appropriate means of promoting correction and rehabilitation" (emphasis added); see also United States v. Manzella, 475 F.3d 152 (3rd Cir. 2007) (It is the policy of the United States Congress, clearly expressed in law, that defendants not be sent to prison or held there for a specific length of time for the sole purpose of rehabilitation. Instead, that legitimate goal of sentencing is to be accomplished through other authorized forms of punishment).    Because Ms. Heinl has truly learned from her ill-advised conduct and the repercussions therefrom, a probationary sentence satisfies the goal of specific deterrence.

### 2.    General Deterrence

Under the circumstances of this case, a custodial sentence is not required to achieve the goal of deterring others from violating the law.   Here, the collateral consequences of the offense, including the extreme publicity surrounding this case, as well as any additional non-custodial punishment this Court could impose, satisfy the goals of general deterrence.

Frequently, the government argues that a prison sentence is the only way to vindicate the government's interest in obtaining justice and promoting deterrence.  Ms. Heinl wishes to point out that while there is no doubt that the likelihood of being arrested and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."  Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." Id.; see also Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm; Restorative Justice and While Collar Crime, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.")  In white-collar cases, research has disclosed that there is no difference in the deterrent effect of a probationary sentence and that of imprisonment. See David Weisburd et al., Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes, 33 Criminology 587 (1995); see also Gabbay, supra, at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").  According to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen et al. Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science, 91 Prison J. 48S, 50S-1S (2011).  In fact, "[t]here is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective "white collar" offenders." See, United States v. Adelson, 441 F.Supp.2d 506, 514 (S.D.N.Y. 2006).    Moreover, another study suggests that it is the criminal justice process, not a lengthy prison sentence, that sends the most convincing message:

> [Studies show] no significant difference in recidivism between white-collar offenders sentenced to prison and similar offenders who did not receive a prison sentence. This finding is consistent with the research on specific deterrence and conventional crime. Based on their review of the literature, these researchers stated, "[a]t least since the 1970's, criminologists have consistently shown that those who are sentenced to prison have, at best, about the same rates of recidivism as non-imprisoned offenders, and in some cases, a much higher rate. They speculated that perhaps the criminal process itself–charge, trial, conviction, and sentencing– has the greatest impact on the offender, and the period of imprisonment adds little by way of deterrence. "Whatever specific deterrence is gained," they argue, "may be produced before the imprisonment sanction is imposed."

Elizabeth Szockyj, Imprisoning White Collar Criminals?, 23 S. Ill. U. L.J. 485, 495 (1999).


**C.     To Protect the Public from Further Crimes of the Defendant**


While recidivism is an important factor for a sentencing judge to consider, Ms. Heinl poses no threat to the community and thus it is not a factor weighing in favor of a term of imprisonment in this case.  *See* Pepper v. United States, 562 U.S. __, 131 S.Ct. 1229, 1242 (2011) (finding the likelihood that the defendant will engage in future criminal conduct is a factor that sentencing courts must consider in imposing sentence).   Ms. Heinl asks the Court to consider that she presents a minimal risk of reoffending.    Until her current legal troubles, Ms. Heinl's life was spent as a law-abiding citizen. As set forth above, she is 44 years old and she has no prior criminal record.  Defendants "over the age of forty…exhibit markedly lower rates of recidivism in comparison to younger defendants."   See, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at p.28 (2004),

www.ussc.gov/publicat/Recidivism_General.pdf. (stating that for those defendant in Criminal History Category I, the recidivism rate for defendants who are over 50 is 6.2%, whereas the recidivism rate for such defendants between the ages of 41 and 50 is 6.9%, and for those defendants who are between ages 21 and 40, it is between 12% and 22%).  Additionally, there is also statistically an extremely low (and arguably nonexistent) risk of recidivism in this case.  The United States Sentencing Commission ("Sentencing Commission") in a recent study[1] identified several characteristics that are indicators of reduced risk of recidivism, including the following:

- Age:  Recidivism rates decline as age increases, from 71.1% under age 21, to 14.0% over the age of 60.[2]

- Lack of criminal history:  Individuals who have zero criminal history points have the lowest rate of recidivism.[3]

Other factors are also of import in considering a defendant's likelihood of recidivism, as detailed in the 2004 Sentencing Commission study[4]:

- Marital Status:  Category I Offenders, who were married and/or divorced have the lowest rate of recidivism.[5]

- Employment Status:  Category I Offenders, who were employed the year prior to the instant offense, have the lowest rate of recidivism, 12.7%.[6]

Here, Ms. Heinl has some college education, she is recently divorced, has a solid record

---

1. Recidivism Among Federal Offenders: A Comprehensive Overview ("Recidivism Study") (Mar. 2016), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf.
2. *Id.* at Appendix A-1, p. 44.
3. *Id.* at Appendix A-1, p. 40.
4. "Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines," United States Sentencing Commission (2004), *available at,* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.
5. *Id.* at p. 29.
6. *Id.*

of legitimate employment and a criminal history score of zero.   Until her current legal troubles, Ms. Heinl's life was spent as a law-abiding citizen.   Consequently, both the Sentencing Commission studies and case law support the determination that Ms. Heinl poses a very low risk of recidivism.   *See, e.g.,* United States v. Darway, 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first-offender status); United States v. Hamilton, 323 Fed. Appx. 27, 31 (2d Cir. 2009) ("the district court  abused its discretion in not taking into account policy considerations with regard to age recidivism  not included in the Guidelines"); United States v. Holt, 486 F.3d 997, 1004 (7th Cir. 2007) (affirming below-guideline sentence based on defendant's age, which made it unlikely that he would again be  involved in a violent crime); United States v. Urbina, slip op., 2009 WL 565485, *3 (E.D. Wis. Mar  5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive  work history, and strong family ties); United States v. Cabrera, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders"); Simon v. United States, 361 F. Supp 2d 35, 48 (E.D.N.Y. 2005) (basing variance in part on defendant's age of 50 upon release because recidivism drops substantially with age); United States v. Nellum, 2005 WL 300073 (N.D. Ind. Feb. 3, 2005) (granting variance to 57-year-old defendant because recidivism drops with age); United States v. Ward, 814 F. Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first-time offender since guidelines do not "account for the length of time a particular defendant refrains from criminal conduct" before committing his first offense).   The public does not need to be protected from Ms. Heinl because of the remote likelihood of recidivism in this case.

**D. To Provide the Defendant With Needed Educational or Vocational Training, Medical Care or Other Correctional Treatment in the Most Effective Manner**

Based on the foregoing, providing Ms. Heinl with needed educational or vocational training, medical care or other correctional treatment while legitimate considerations, are not issues which warrant a custodial sentence in this case.  See 18 U.S.C. §3553(a)(2)(D).  In fact, as set forth above, Ms. Heinl possesses the ability to maintain employment, raise her child and live a long and prosperous life with the current educational and vocational skills she possesses.

**III. Kinds of Available Sentences**

By statute, a court must consider the kinds of sentences available in this case. 18 U.S.C. §3553(a)(5).  The statutory maximum sentence that could be imposed in this case is six months' imprisonment and there is no mandatory term of imprisonment applicable in this case.  This Court could also impose a term of probation in this case.   Ms. Heinl asserts that, because she has pled guilty to a petty misdemeanor, this Court can only sentence Ms. Heinl to a term of probation not to exceed five years OR a term of imprisonment not to exceed 6 months.  She asserts that a sentence of imprisonment followed by a term of probation is illegal.  The government has advocated for a term of imprisonment of 14 days followed by a three-year term of probation.  Ms. Heinl asserts that such a sentence is illegal because 18 U.S.C. §3551(b) does not permit a sentence of probation and a sentence of imprisonment be imposed for the same offense.  Likewise, despite the government's best efforts to convince the Court otherwise, the language of 18 U.S.C. §3561(a)(3) specifically prohibits such a sentence.

16

Recently, in <u>United States v. Virginia Marie Spencer,</u> Case No. 21-147-02 (CKK), District Court Judge Colleen Kollar-Kotelly imposed a sentence of 90 days' incarceration followed by 36 months' probation after Defendant Spencer pled guilty to the same offense to which Ms. Heinl pled guilty arising from Defendant Spencer's conduct on January 6, 2021 at the United States Capitol.   Three days after sentencing, Defendant Spencer filed a motion to modify her sentence challenging the legality of the sentence.   More specifically, Defendant Spencer argued that 18 U.S.C. §3551(b) provides that sentences of probation and imprisonment are mutually exclusive and cannot each be imposed for the same offense.   The government, making essentially the same arguments it has made in the sentencing memorandum filed in this case, opposed the modification of Defendant Spencer's sentence.

After entertaining argument from the parties, Judge Kollar-Kotelly granted Defendant Spencer's motion and modified Defendant Spencer's sentence to a sentence of imprisonment of 90 days with no probation.   Judge Kollar-Kotelly specifically noted that

> The "statute [Section 3551(b)] provides a choice among three alternative punishments." <u>United States v. Martin,</u> 363 F.3d 25, 35 (1st Cir. 2004). "If a court chooses to impose probation, it does so pursuant to the terms of § 3561 . . . [which] prohibits the imposition of probation when the defendant is sentenced at the same time to a term of imprisonment[.] [This] further emphasiz[es] the alternative nature of incarceration and probation in any one sentencing decision." *Id.* (internal quotation marks and emphasis omitted). Accordingly, a plain reading of the statutory sections at issue – 3551(b) and 3561– leads to the conclusion that a district court must choose between probation and imprisonment when imposing a sentence for a petty offense.[fn omitted] This Court is unpersuaded by the contrary holding in <u>Posley,</u> a case cited by the Government, as it neither considers Section 3551 nor is it binding precedent.

17

See Memorandum Opinion and Order, Doc. No. 70, at 5, <u>United States v. Virginia Marie Spencer</u>, Case 1:21-cr-00147-CKK (D.C. January 19, 2022)

Further, imposition of a term of supervised release after imposition of a term of imprisonment would likewise be illegal in this case.   Title 18 U.S.C. §3583(b) authorizes terms of supervised release as follows:

(1)     For A Class A or Class B felony, not more than five years;

(2)     For a Class C or Class D felony, nor more than three years; and

(3)     For a Class E felony, or for a misdemeanor (other than a petty offense), not more than one year.

In this case, because Ms. Heinl has pled guilty to a Class B misdemeanor – a petty offense – the law does not authorize this Court to impose period of  supervised release following a term of imprisonment.   Accordingly, the sentences available to this Court in this case are a term of probation up to five years OR a term of imprisonment up to six months.

**IV. The Sentencing Guidelines Calculation**

As set forth above, the sentencing guidelines do not apply to the instant offense of conviction.  As a result, this factor is not relevant here.

**V. Any Pertinent Policy Statements Issued by the Sentencing Commission**

Ms. Heinl does not believe that there are any pertinent policy statements from the Sentencing Commission that are relevant to sentencing in this case.

**VI. The Need to Avoid Unwarranted Sentence Disparities Among Defendants With Similar Records Who Have Been Found Guilty of Similar Conduct**

An additional concern of the federal statutory scheme is the need to avoid unwarranted sentencing disparities among defendants with similar criminal histories who have been convicted of similar conduct.    18 U.S.C. §3553(a)(6).    This concern may also include the consideration of unwarranted similarities among defendants who are not similarly situated.  See Gall, 552 U.S. at 56, 128 S.Ct. at 595. (Sentencing court "also considered the need to avoid unwarranted similarities among other co-conspirators who were not similarly situated.)

Ms. Heinl recognizes that hundreds of people have been charged as a result of the January 6th riot and they will each be individually sentenced based on their respective roles. Avoiding unwarranted sentencing disparities could be a daunting task in these cases based on the number of defendants alone. Each case has its own relevant facts.    Ms. Heinl does agree with the government that each defendant should be individually sentenced based on their individual circumstances.  However, there are a number of defendants who have pled guilty to the same offense as Ms. Heinl and who been sentenced to a term of probation. Ms. Heinl includes the following cases only because those cases involve circumstances that arguably

involve conduct more serious than that committed by Ms. Heinl:

     - <u>United States v. v. William Blauser</u>, 1:21-CR-386-TNM ($500 fine – Defendant pushed past law enforcement, had skirmish with law enforcement and held a sign in Capitol);

     - <u>United States v. Danielle Doyle</u>, 1:21-CR-324-TNM (2 months' probation, $3,000 - Defendant climbed through a broken window to enter the Capitol);

     - <u>United States v. v. Sean Cordon</u>, 1:21-CR-269-TNM (2 months' probation – Defendant entered through a broken window near Senate Wing and recorded video);

     - <u>United States v. v. Eliel Rosa</u>, 1:21-CR-68-TNM (12 months' probation – Defendant entered Senate Chamber, heard gunshots and posted photographs on Facebook);

     - <u>United States v. Anna Morgan Lloyd</u>, 1:21-CR-164-RCL (36 months' probation – Defendant posted photographs on Facebook bragging about being inside the Capitol);

     - <u>United States v. v. Valerie Ehrke</u>, 1:21-CR-97-PLF (36 months' probation – Defendant posted photographs on Facebook);

     - <u>United States v. v. Jacob Hiles</u>, 1:21-CR-97-PLF (36 months' probation – Defendant wore goggles inside Capitol and posted "selfie" photographs on Facebook);

     - <u>United States v. v. Douglas Wangler</u>, 1:21-CR-365-DLF (24 months' probation – Defendant posted video pumping fist on Facebook while inside Capitol);

     - <u>United States v. v. Bruce Harrison</u>, 1:21-CR-365-DLF (24 months' probation – Defendant posted video pumping fist on Facebook while inside Capitol);

     - <u>United States v. v. Thomas Gallagher</u>, 1:21-CR-41-CJN (24 months' probation – Defendant refused police orders to leave and was physically arrested on site inside Capitol);

     - <u>United States v. v. Andrew Hartley</u>, 1:21-CR-98-TFH (36 months' probation – Defendant entered through a broken window, wore a gas mask and took photographs).

The government cites to two particular cases to support its argument that this Court should impose a sentence of incarceration on Ms. Heinl.  The government first cites to <u>United States v. Eric Torrens</u>, 1:21-CR-204-BAH.    Notably, Torrens was sentenced to a term of

probation of 36 months with a condition that the first 90 days be served on home detention. Unlike Ms. Heinl, Torrens was recorded screaming "We're going in!" just prior to entering the Capitol, attempting to incite others around him.  He was with a friend who recorded Torrens' exclamation.   The government also cites to United States v. Jeremy Ryan Sorvisto, 1:21-CR-320-ABJ.     Sorvisto did not cooperate with law enforcement, refused to acknowledge his conduct and used another person's Facebook account to report that he was being "gassed".   He also instructed others to destroy evidence of his presence in the Capitol. The facts of this case are wholly inapposite to Ms. Heinl's case.    These two cases are not persuasive in aiding this Court to avoid unwarranted sentencing disparities in Ms. Heinl's case.


**VII.    The Need to Provide Restitution to Any Victims of the Offense**


An additional concern of the federal statutory scheme is the need to provide restitution to any victims of the offense of conviction.   18 U.S.C. §3553(a)(7).   The plea agreement executed in this case acknowledges that restitution will be ordered in this case in the amount of $500 and after sentencing, Ms. Heinl will promptly pay it.

## **Conclusion**

Ms. Heinl respectfully requests that this Court sentence not just the person who unlawfully entered the U.S. Capitol but also the person who has been described in the Presentence Investigation Report and in the various character letters submitted to the Court. Ms. Heinl made a very serious and ill-advised error in judgment when she entered the U.S. Capitol along with hundreds of other persons. She is not, however, a bad person. It is respectfully requested that the Court consider the comments herein, invoke its discretion and impose a probationary sentence in this case, the sentence the government originally anticipated would be the appropriate sentence in this case.

Respectfully submitted,

s/ Martin A. Dietz
Martin A. Dietz, Esquire
DC Bar I.D. No. PA0093
Pa. I.D. No. 69182
2885 Wildwood Road Extension
Allison Park, PA 15101
(412) 261-5520
(412) 312-3804 fax
mdietzesquire@gmail.com
www.MartinDietzLaw.com

Attorney for Defendant,
Jennifer Heinl